Sebok *v.* Pennsylvania Edison Company,
Appellant.

Argued May 16, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, LINN, STERN and BARNES, JJ.

*John J. Haberstroh,* with him *Philip N. Shettig* and *Thomas A. Swope,* for appellant.

*Edward J. Harkins,* of *Scanlan & Harkins,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, October 3, 1938:

Plaintiff's husband was killed by coming in contact with a wire of defendant company which carried sixty-six hundred volts of electricity and which had fallen to the ground. This action, brought to recover damages for his death, resulted in a verdict and judgment in plaintiff's favor from which defendant appeals.

The wires of defendant, carrying the deadly current mentioned, were strung above the roof of the dwelling owned and occupied by deceased and plaintiff, and also over or close to the roof of the adjoining house, occupied by the mother of deceased. Both houses were frame and were about forty feet apart. Whether the wires were

placed above the houses before or after they were built was a disputed question on the trial. Defendant obtained the right to erect them by a grant from a coal company which had owned the tract of land of which the portion occupied by the two houses was part. The grant was indefinite as to where the wires were to be strung.

About midnight on October 28, 1931, fire broke out in the house of the mother, and the deceased, being aroused thereby, procured a hose, which he attached to a spigot on his house, and proceeded to squirt water on his dwelling to save it from destruction. The house of the mother was totally consumed. During the course of the fire the intense heat from it melted one of the high tension wires above the house. It fell across the roof of the deceased's house and across a wire clothesline on his lot. The end of it was on the lot of a neighbor, farther along the highway. Sparks and a buzzing sound were emitted from the wire where it touched the clothesline and at its end. Whether the deceased was aware of these manifestations is in controversy. From his position between his own house and the burning one and because of the smoke, he may not have been. This conclusion also applies to warnings of danger from the wire by bystanders. Both of these problems were for the jury.

While playing the water from the hose on his home it is a fair assumption that he was excited and overwrought. He was between his house and the burning one walking up and down as he endeavored to save his own. Under such circumstances a man would not be as attentive to and as observant of all that was happening around him as mere spectators would be, who did not have his personal concern. There was testimony that as he moved about, hose in hand, he stepped on the wire, which at that point was concealed by weeds, and was instantly killed. On the other hand, witnesses said he stooped and picked up the wire. Which was the true happening was for the jury's solution, as were alleged statements made

by him as to the presence of the wire, as to his knowledge of its danger, and his request for gloves, all of which were contradicted.

The charge of negligence most pressed by plaintiff is the stringing of the deadly wires too close to the roofs of the houses. There was testimony in plaintiff's case that they had sagged and were only four feet above the roofs. Other witnesses testified to a distance of nine feet. Whatever the distance, they were close enough to be parted by the heat from the burning house. We are not prepared to say as a matter of law that placing high tension wires over a frame house, where they are liable to part if the house caught fire, was not negligence. Point is made of the fact that the current was not turned off for some time after the wire fell (for just how long witnesses differed), and that fully sufficient automatic circuit breakers were not in the substation from which the wire led, and that the man in charge of the substation, whose duty it was to switch off the current, if the automatic breakers did not do so, was employed on a twenty-four-hour basis and was asleep at the time of the fire. We think, without these factors in the case, there was sufficient evidence of negligence in the way the wires were maintained, sagging to within four feet of the roofs, to carry the question of negligence to the jury.

It must be remembered that we are here dealing with one of the most dangerous agencies known to man—electricity. As to it, Mr. Justice afterwards CHIEF JUSTICE MITCHELL, announced, in the court's behalf, this guiding principle: "Wires charged with an electric current may be harmless, or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public, therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case. The company, however, which uses such a dangerous agent is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to

avoid injury to every one who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them": *Fitzgerald v. Edison Electric Co.,* 200 Pa. 540, 543, 50 A. 161. We have quoted this language many times with approval, quite recently in *MacDougall v. Penna. Power & Light Co.,* 311 Pa. 387, 392, 166 A. 589, and *Ashby v. Phila. Electric Co.,* 328 Pa. 474, 195 A. 887. It cannot be said that defendant used "the very highest degree of care practicable" in locating the wires as it did and in allowing them to sag so close to the roofs of the houses. One of the expert witnesses called by defendant testified that all electric companies avoid putting deadly wires above houses where they can (and it is not claimed that it was necessary in this instance to so place them), because there is danger to life, if the house catches fire and the wires part.

Complaint is made that the court permitted it to be shown that, a number of years before, a fire had occurred in a building, in the neighborhood of the one with which we are concerned, and that a wire of defendant above the building had been annealed and had fallen. This testimony was offered solely to show notice to defendant of the danger from fire to wires strung over frame buildings and was carefully so restricted by the court in its charge. Defendant, in its brief, admits that it is a matter of common knowledge in the electric industry that there is such a danger. This being so, we are at a loss to see how the receipt of this testimony prejudiced defendant. Moreover, we are of opinion that the testimony was admissible under the rulings in *Muller v. Kirschbaum Co.,* 298 Pa. 560, 148 A. 851, and *Fisher v. Pomeroy's, Inc.,* 322 Pa. 389, 185 A. 296, and cases there cited.

There are other assignments covering the admission and rejection of testimony and excerpts from the charge. We have carefully considered all of them and find none which would warrant a reversal.

The judgment is affirmed.