## Brillhart *v.* Edison Light & Power Company, Appellant.

·Argued May 24, 1951.   Before DREW, C. J. STERN,
STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

W. *Burg Anstine,* with him *Robert I. Shadle, Anstine & Shadle, Horace G. Ports* and *Fisher, Ports & May,* for appellant.

*Arthur Markowitz,* with him *Markowitz & Liverant,* for appellee.

OPINION BY MR. JUSTICE JONES, June 27, 1951:

This appeal by the Edison Light & Power Company is from a judgment entered against it (after remittitur) on a jury's verdict in favor of the plaintiff administratrix for damages due her individually and her children for the wrongful death of her husband. At trial, the defendants were the electric company, Norman J. Bortner, the owner of the premises on which the fatal accident occurred, and P. W. Strickland, the employer of the deceased. Strickland had been brought upon the record as an additional defendant by the other two (original) defendants. The jury also found in favor of the defendants Bortner and Strickland.

Charles Frederick Brillhart, the plaintiff's decedent, was electrocuted when a metal pipe, which he and a fellow worker were installing in a well-pump on Bortner's farm, came in contact with a high tension uninsulated wire of the electric company, carrying 4600 volts of electricity. The inserting of the pipe into the well was a necessary operation in the installation of a new pump in Bortner's pump-house which work Brillhart's employer had undertaken under contract with Bortner.

The electric company filed motions for judgment n.o.v. and for a new trial, both of which were denied by the court below, and judgment was entered on the reduced verdict as already stated. This appeal by the electric company followed.

As to its motion for judgment n.o.v., the appellant contends that the evidence fails to show negligence on its part and that the deceased was guilty of contributory negligence as a matter of law. In support of the new trial motion, the appellant ascribes error in the trial court's admission in evidence of photographs of the scene taken after the accident when certain material changes had been made in attendant structures and in refusing to admit in evidence testimony offered by the appellant in regard to safety standards fixed by the Electrical Code of the Federal Bureau of Standards. The appellant also urges that the verdict, as reduced by remittitur, is still excessive and that it is fatally inconsistent in that the jury held the electric company liable while it exonerated the defendant Bortner.

The pump-house in which the deceased and his fellow workman, one S. T. Hause, were working at the time of the accident was 10 feet square and 7½ feet high. It sat to the side of Bortner's dwelling on a stone foundation. It had a door in the front toward the dwelling and a window in each side adjacent to the front. In the center of the roof there was a trap door or covered hatch 18 inches square, the opening being directly over the pump below. The pipe which the two men were installing was 21 feet long; and, at one end of it, they had attached a short elbow pipe which projected at right angles to the main pipe. In order to get the end of the pipe into the well inside the pump-house, Brillhart and his co-worker pushed the elbowed end of the pipe in through one of the windows and up and out the trap-door opening or hatch in the roof until the lower end of the pipe was in position over the well. When this stage of the operation was reached, the pipe was in an upright position with approximately two-thirds of its length above the roof of the pump-house. Both men were holding the pipe with both

hands. Brillhart had one hand above and the other below Hause's hands. While the workmen were in that position, the upper part of the pipe came in contact with the uninsulated electric wire above the pump-house and Brillhart was instantly killed by the electric current conducted through the pipe to his body and the ground. Hause received a burn on the hand.

The wire which the pipe touched was one of two parallel wires running east and west along the north edge of Bortner's property, being there suspended between two poles 175 feet apart. These wires each carried 4600 volts of current, were three-sixteenths of an inch in diameter and were uninsulated. The southernmost wire passed along but above the north side of the pump-house, the distance between the wire and the roof of the pump-house being 10½ feet. The wires had been put up in 1930 while the pump-house had been there "Around forty years . . . even more." The pump-house had always had the trap door in the roof for the purpose of permitting pipes to be run out of the well and pump-house when they needed to be replaced or repaired. During the sixteen years the wires had been up prior to the accident, they had become blackened by the weather and the flash or shine of the copper was gone so that the "wire looked as though it was insulated." From the ground, the wires appeared like ordinary "house wires" of which there was a "maze" of about 12 or 14 in the immediate vicinity of the pump-house. "There were some shrubbery and trees around." The household wires were visible, but the high tension wires could not be seen ". . . unless you strained yourself a little. If you looked up in the air, you could see them, but not close to where the men were working." There was no warning posted to give notice of the presence of high voltage wires. One of the defendant's witnesses testified that according to the standards in the industry "Wires should have a clear-

ance of eighteen feet above building and twenty feet above public roads." As already noted, the high tension wire nearest the pump-house cleared it by only 10½ feet. An inference mathematically deducible from the testimony is that the pipe, which was of standard length, protruded above the top of the pump-house approximately 14 feet.

The evidence in the case was amply sufficient to carry it to the jury on the question of the defendant's causative negligence. A supplier of electric current "is bound not only to know the extent of the danger, but to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them": *Fitzgerald v. Edison Electric Illuminating Company,* 200 Pa. 540, 543, 50 A. 161; *Kaufman v. Pittsburgh Railways Company,* 363 Pa. 96, 100, 69 A. 2d 90; *Commonwealth Trust Company of Pittsburgh v. Carnegie Illinois Steel Company,* 353 Pa. 150, 153-154, 44 A. 2d 594; *Sebok v. Pennsylvania Edison Company,* 331 Pa. 524, 527-528, 1 A. 2d 680; *Ashby v. Philadelphia Electric Company,* 328 Pa. 474, 478, 195 A. 887; and *MacDougall v. Penna. Power & Light Co.,* 311 Pa. 387, 392, 166 A. 589. "When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense": 20 R.C.L., quoted with approval in *Hawk v. Pennsylvania R. R.,* 307 Pa. 214, 220, 160 A. 862; *Ashby v. Philadelphia Electric Company,* supra; and *Commonwealth Trust Company of Pittsburgh v. Carnegie Illinois Steel Company,* supra. As recognized in *Shapiro v. Philadelphia Electric Company,* 342 Pa. 416, 419, 21 A. 2d 26, "It has frequently been held that the failure to insulate wires so placed [near a building] is negligence." See also *Mullen v. Wilkes-Barre Gas and Electric Company,* 229 Pa. 54, 59, 77 A. 1108.

Although a minimum clearance for high voltage wires strung over buildings and land has not been statutorily prescribed, the common usage in the business is a fair test or standard of care: *Maize v. Atlantic Refining Company*, 352 Pa. 51, 57, 41 A. 2d 850. As stated in *Koelsch v. The Philadelphia Company*, 152 Pa. 355, 362, 25 A. 522,—"While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken." Here, the evidence justified a finding by the jury that 18 feet was generally considered by purveyors of electric current as being a safe minimum clearance for high voltage wires over buildings; yet, the defendant company allowed its uninsulated high tension wires to pass over the Bortner pump-house at a distance of 10½ feet though the building had a trap door in the roof out of which a pipe in need of repairs would necessarily have to be taken from the well. Having failed to observe any active precautions, which experience reasonably should have suggested, the defendant could at least have taken the passive precaution of warning others of the dangerous wires by posting notices of their proximate presence.

As to the suggested contributory negligence on the part of the deceased, it is to be borne in mind that the general public is not bound to the high degree of foresight in respect of danger from electric wires as is the company maintaining them. "Wires charged with an electric current may be harmless or they may be in the highest degree dangerous. The difference in this respect is not apparent to ordinary observation, and the public, therefore, while presumed to know that danger may be present, are not bound to know its degree in any particular case": *Fitzgerald v. Edison Electric Illuminating Company*, supra. As we recently

said in *Kaufman v. Pittsburgh Railways Company,* supra, at p. 100,—"While the plaintiff was, of course, bound to know that more or less danger from electricity was inherent in the transmission line, he was not chargeable with as high a degree of knowledge as to the extent of the danger as was the company which maintained and operated the line." Of course, the duty of one working around electric wires, which he knows carry a high voltage, is to avoid coming in contact with them: *Ridgeway v. Sayre Electric Co.,* 258 Pa. 400, 410, 102 A. 123; *MacDougall v. Penna. Power & Light Co.,* supra, at p. 394. But, there is not a shred of evidence in this case that the decedent either saw or should have seen the high voltage wires or knew of the possible danger from them in the removal of the pipe from the well. Any question of Brillhart's contributory negligence was, in the circumstances, for the jury to determine. Not possibly could the court have declared him to have been at fault as a matter of law.

The trial court did not err in excluding the electric company's offer to prove the standards promulgated by the Electrical Code of the Federal Bureau of Standards for the height and location of electric wires. The question of the electric company's negligence in the premises depended upon whether its maintenance of high voltage wires over the pump-house was what a reasonably prudent person would have done in the circumstances. Moreover, the offer was not to prove the indicated standards by Bureau records but by what a witness would orally say they were. The testimony was obviously objectionable under the "best evidence" rule. The witness was allowed to testify as to the general practice followed by electric companies with respect to the height and location of high tension wires which practice, incidentally, proved to require a greater clearance than what was actually followed in the instance here involved.

The appellant's objection to the testimony concerning certain changes made in the location of the high voltage wires and in the pump-house hatch after the accident is without merit. The testimony was not admitted to show negligence of the defendants in the prior condition obtaining but was received in evidence without objection in explanation, for purposes of accuracy, of several photographs of the scene, taken some time after the accident, which had been admitted in evidence. The only thing whereof the appellant could have logically complained was the trial court's exercise of discretion in admitting the photographs in evidence. (No question on that score is urged here.) After the photographs had been admitted in evidence, it was then necessary that the changes be eliminated by explanatory testimony; to that, appellant's counsel acquiesced at least tacitly. It was not until near the close of the witness's examination that defendants' counsel belatedly objected, saying that ". . . it was not until the witness had finished that I realized that he had made a number of statements which we considered objectionable." The trial judge very properly responded,— ". . . in all fairness to the Court, this objection should have been made at the time." Counsel then expressed his confidence ". . . that the Court will cover that point in its charge . . . ." The trial judge at once explained to the jury that the testimony had been admitted ". . . only to show what the conditions were on September 14, 1946, the date that the accident happened . . . ." And, in his charge, the trial judge expressly cautioned the jury that the testimony with reference to some change in the pump-house and in the line was not "any indication whatever of any negligence." Finally, the court affirmed unqualifiedly a point for charge submitted by the defendants, touching the very point here in question, which counsel for defendants affirmatively acknowledged was covered. All appropriate steps to guard

against any possible harm to the defendants having thus been taken, the appellant will not now be heard to complain further.

The verdict absolving Bortner and holding the company liable was in no sense inconsistent. The duty of care severally resting upon them was vastly different in degree. Bortner neither owned nor had control over the high voltage wire installation.

The verdict, as reduced by the remittitur, cannot reasonably be said to be excessive.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE BELL:

The degree of care required by the majority opinion imposes too great, too unreasonable, and too impractical a burden upon the defendant. This case is ruled in principle in favor of the defendant by *O'Gara v. Philadelphia Electric Company*, 244 Pa. 156, 90 A. 529. In that case the electric company had its uninsulated electric wires 8 or 10 feet above the sidewalk where children played. A seven year old boy climbed a pole supporting an awning and while walking along this horizontal pole came in contact with the uninsulated wire. The entry of a judgment n.o.v. was affirmed by this Court on the ground that the electric company had maintained its wires at a height inaccessible by anyone in the ordinary or usual use of the sidewalk and it was bound to guard against only the ordinary and usual use of the premises. Neither the boy nor anyone lawfully in proximity to defendant's wires was likely to come in contact with them.

Moreover, the majority neglected to mention in its opinion two very important facts: (1) the decedent knew exactly where the defendant's wires were strung when he entered the pump-house; (2) The nearest wire was not only 10½ feet above the pump-house roof, *but*

*was 5 feet horizontally away from the hatch or opening* in the pump-house roof, and if the decedent had not negligently let his pipe fall a distance of 5 feet into defendant's wire, the accident would never have happened.

For these reasons I would enter judgment for the defendant non obstante veredicto.