# Jowett, Administratrix, et al. v. Pennsylvania Power Company

*Margiotti & Casey, Marvin D. Power and J. W. McWilliams,* for plaintiffs.

*Brockway, Acker & McKay,* for defendant.

BRAHAM, P. J., June 1, 1954. — Plaintiff, Marjorie Jowett, is administratrix of her deceased husband, Lee A. Jowett, and Jonathan Jowett is the father of Lee A. Jowett, now deceased. Lee was killed and Jonathan was burned by a bolt of electricity from defendant's

lines which reached them when the television aerial which they were repairing fell into defendant's line. The repairs consisted of reattaching to the antennæ a guy wire which had become detached during a storm.

At trial of plaintiffs' suit for damages a compulsory nonsuit was entered. Their motion to take off the compulsory nonsuit is pending before the court en banc.

Plaintiffs contend that the novelty of the situation requires a new approach to the problem of the liability of the power company for structures which may fall into its lines, the novelty arising from the new television industry and the aerials which are currently employed. This contention calls for a careful statement of the facts. Since summary judgment of nonsuit was entered the facts must be considered in the light most favorable to plaintiffs.

The fatal event happened January 20, 1952, at Clarksville, Mercer County, Pa. Lee A. Jowett and his family lived with the wife's parents in the southern half of a house on the east side of Mill Street in Clarksville, a street running north and south. The northern half of the house was occupied by a family named Kennedy. The house was about 36 feet long and 18 feet wide with a porch on the west face about five feet wide and 24 feet long. The distance from the ground to the peak of the roof on the north side of the house was 22¼ feet.

In front of the house and along the street was a line of telephone poles and wires with two wires of the Pennsylvania Power Company on top. The electric lines were installed in 1926; the two top wires were installed in 1938. The line of poles was about 10½ feet from the paved portion of Mill Street and on the street side of a walk or path which served as sidewalk. The wires of defendant were strung on the poles of the Bell Telephone Company at the height of about 39 feet from the ground. The distance between poles was

about 146 feet and the sag in the wire opposite the southwest corner of plaintiffs' house was about 2⅓ feet. The line was 22.08 feet from the peak of the roof of the house.

The two wires of defendant on top of the telephone pole carried what are referred to as transmission voltages of 7,200 volts, they representing a middle stage between the lines carry very high voltages of from 23,000 to 132,000 volts and the service lines, which carry about 115 volts. There were four of these service lines below the cross arm which carried the high tension wires. They served the houses and the street lights of the village. The top wires were not insulated. The service wires were insulated. A current of 7,200 volts passing through a human body would ordinarily be fatal. A current of 115 volts passing through a body would do it harm but would not necessarily kill.

Jonathan Jowett and his wife gave their son Lee and his family a television set for Christmas, 1951. The antennæ was installed at some time between Christmas and New Year's. The antennæ consisted of two lengths of pipe threaded and connected by a threaded coupling. The over-all length was 47 feet 6 inches. Plaintiffs' evidence discloses that the two lengths of pipe were coupled together in a defective fashion in that only about one-fourth inch of one of the pipes had been screwed into the coupling. The defective union was the point at which the aerial broke, as will later appear. On top of the length of pipe were the familiar cross pieces or antennæ which make up the real receiving apparatus, extending out from the pipe about 4 feet 7½ inches.

The aerial was installed by the two Jowetts and two other men. The bottom of the pipe was placed on a stone in a hole about 18 inches below the surface. The pipe was designed to stand in an erect position at the south end of the house and to be fastened to the house

by two metal clamps or U bolts, one midway up the side of the house and one at the comb. The height of the aerial was about 25 feet above the roof.

In the actual erection two of the four men stood on the roof and lifted the aerial by guy wires. Then the pipe and antennæ were secured in their erect position by two clamps and by four guy wires, one to each corner of the house. There was a fourth line which ran to a tree south of the house but this seems to have been removed. The aerial was controlled during erection by guy wires and hand lines.

On January 18, 1952, after a severe windstorm, it was discovered that the southeast guy wire had torn loose from the aerial. On January 20, 1952, the two Jowett men set out to repair it. They planned to raise the aerial free of the ground, then to move the butt of the pipe toward the south and away from the wall until the antennæ could be reached from the roof and the guy wire reattached. To this end the two men loosened the lower of the two U bolts, dug a hole to allow the pipe to be lifted from the ground and were in the act of lifting the pipe and drawing the butt away from the wall when the aerial pipe broke at the coupling which was about one foot below the side of the roof. The upper length of pipe and the antennæ fell on the roof. Then they apparently rolled off the roof toward the west and became engaged with defendant's power lines, which carried 7,200 volts. Lee Jowett, the younger man, was electrocuted and Jonathan Jowett, the father, was severely burned.

Jonathan Jowett, the survivor, testified that he did not know that the two top lines of defendant which ran in front of his home were high voltage lines. He is 52 years old and has been for 25 years in the business of installing neon signs, a trade which requires him to work with electricity. Lee Jowett was about 31 years of age and had been seven years in the neon sign busi-

ness. A number of witnesses testified to their lack of knowledge that the two top wires carried a high voltage of electricity.

At trial plaintiffs concentrated upon proving that defendant power company was negligent in failing to warn Lee Jowett of danger from the proximity of his television aerial. This involves knowledge of the condition on the part of defendant. At this point plaintiffs called as witnesses Gladding Wilbirt, a meter reader for defendant, and Numa Vidal, defendant's division manager in Sharon, a district which includes Clarksville.

Mr. Vidal testified that he had observed the growth in the number of television aerials in his district, had followed a practice of warning those known to be dangerous, and had given orders to the employes of the company, including meter readers, to report installations which because of their proximity to the lines appeared to be dangerous.

Mr. Wilbirt testified that he had received orders to look out for hazards to the power lines, including television aerials, but that he had not reported nor noticed plaintiff's aerial. He did read the meters once during the time involved, namely on January 8, 1952. He testified he did walk, while reading meters, from the back of the church which was immediately south of plaintiff's home diagonally to the back of plaintiff's home. Inferentially he should or might have seen plaintiff's aerial. Plaintiffs asked and were allowed to cross-examine Wilbirt as to a prior contradictory statement made to Vito Adamo, one of plaintiffs' attorneys. Mr. Adamo said that Wilbirt told him "he noticed the television aerial prior to the happening of the accident, but that he didn't remember turning it in". A party may cross-examine his own witness, if his plea of surprise is allowed, and may call witnesses to contradict the witness (2 Penna. Evidence. Henry,

page 263, §809) but in such case the contradictory evidence is not substantive but operates only to neutralize the present evidence of the witness being contradicted: Idem: McNerney v. Reading City, 150 Pa. 611, 615.

Plaintiffs rely upon a notation in Wilbirt's meter book but this is opposite the report for November 1952.

Plaintiffs' theory of defendant's negligence is simple. A company supplying "electric current is bound to use the very highest degree of care practicable to avoid injury to everyone who may be lawfully in proximity to its wire and liable to come into contact with them": Brillhart v. Edison Light & Power Company, 368 Pa. 307, 312. The antecedent probability of harm is the true basis of liability: Matlack v. Pennsylvania Power & Light Co., 312 Pa. 206, 210; Dahlstrom v. Shrum, 368 Pa. 423, 428; Scurfield v. Federal Laboratories, Inc., 335 Pa. 145, 150; Blake v. Fried, 173 Pa. Superior Ct. 27, 35, 36. With these principles we are in accord.

Plaintiffs argue further: Defendant's manager, Vidal, recognized the general danger from the television aerials which overtopped defendant's power lines. A warning should have been given to plaintiffs. The knowledge which Wilbirt gained or should have gained concerning plaintiffs' aerial was notice to defendant because of the instructions given to the meter readers.

Before we seek to impose upon the power company liability for every television aerial which stands near its lines the implications of this duty must be considered. The power company could not grant or withhold a license to build the aerial. It had no control over the land on which the aerial stood, nor over the manner of its erection. No notice was given to it of the breaking of the guy wire.

An attempt is made to envelop this case with the aura of a new and growing industry. Yet in its simplest form it is the question whether the power

company is liable for structures which tower over its lines. Church steeples, flag poles, sign boards, the cornices, roofs and embellishments of building are all structures which might become in disrepair and fall upon the lines of power companies. Without knowledge of a specific defect which may result in a fouling of its lines the company is not put on notice by every high structure near the lines.

The case principally relied upon by plaintiffs is Brillhart v. Edison Light & Power Company, 368 Pa. 307. There the electric company maintained a high tension line above a pump house at less than the minimum safe distance accepted in the industry. Plaintiff's intestate, in helping to install a pump, lifted a pipe through a hole in the roof. It came in contact with the wire and he was electrocuted. The company operating over the land of another below the safety zone was bound to anticipate and guard against possible injury to workmen about the pump house. In the case at bar defendant had its wires on that part of the street between sidewalks and roadway. They were well up out of harm's way. No one contends they should have been insulated.

Defendant was bound to provide for all events which were reasonably foreseeable. It was bound for example to foresee the possibility of the blowing down of the aerial during a storm. But it was not bound to anticipate that the aerial was defective in that the two joints of pipe were joined only in the most precarious fashion or that casual repairs would be made in a most negligent fashion: Reed, admx., v. Duquesne Light Co. et al., 354 Pa. 325; Mirnek v. West Penn Power Co., 279 Pa. 188; Dahlstrom v. Shrum, 368 Pa. 423, 428.

The considerations last mentioned relate, more particularly, to proximate cause and contributory negligence and it is indeed these considerations which are

decisive of this case. They distinguish this case from Fox v. Keystone Telephone Company et al., 326 Pa. 420, relied upon by plaintiffs.

The alleged negligence of defendant was not the efficient, legal cause of the injuries to the two Jowett men. Plaintiffs contend that they have produced evidence of defendant's negligence sufficient to take the case to the jury, citing, inter alia, Irwin Savings & Trust Company v. Pennsylvania Railroad, 349 Pa. 278; but in that case the law was stated at page 283:

"Where it is alleged that an injury arose from negligence the question of the proximate cause is to be decided by the jury upon all the facts of the case, but where the facts are undisputed, and the intervening agency is manifest, it is not error for the court to withhold the evidence from the jury: Hoag v. Lake Shore & Michigan Southern Railroad Co., 85 Pa. 293; West Mahanoy Township v. Watson, 112 Pa. 574, 3 A. 866; Rugart v. Keebler-Weyl Baking Co., 277 Pa. 408, 121 A. 198; Leoni v. Reinhard, 327 Pa. 391, 194 A. 490; Joseph v. United Workers Assn., 343 Pa. 636, 23 A. 2nd 470; McGrath v. E. G. Budd Mfg. Co., 348 Pa. 619, 36 A. 2nd 303".

The "intervening agencies" are two: First the faulty construction of the aerial, for which plaintiffs may not be entirely responsible because the evidence does not show who screwed the two lengths of pipe together; and second, the conduct of the two Jowett men in loosening and lifting the aerial without securing it.

Our adjudicated cases clearly indicate that the case was properly taken from the jury on the issue of proximate cause. In the Irwin case, cited by plaintiffs and above quoted, defendant allowed a culvert to become blocked and a pool to form into which some children fell through the ice where they were drowned; the act of the children was held to be the proximate cause. In Parker v. Pennsylvania Power Co., 301 Pa. 375, the

deceased was electrocuted when in installing a radio aerial he threw a wire over defendant's line which came in contact with some spots on the wire which were not insulated. The court refused to say as matter of law that the defective insulation was the proximate cause. In Reed, admx., v. Duquesne Light Co. et al., 354 Pa. 325, where the deceased was electrocuted operating a power crane beneath defendant's lines, an activity of which defendant had no notice, the conduct of the deceased was held to be the proximate cause. In Elliott v. Allegheny County Light Company, 204 Pa. 568, plaintiff was a painter, and while falling grasped a line of defendant which was improperly insulated. The act of plaintiff was held to be the proximate cause. Kosson et al. v. West Penn Power Co., 293 Pa. 131, and Roche v. Pennsylvania Railroad Co. are cases where boys fell into the installations of a power company. The failure of the company to provide a guard was held not to be the proximate cause.

The theory of contributory negligence is really a variant of the theory of proximate cause. If the conduct of plaintiff himself causes his injury he cannot recover. The facts in this case indicate clearly that the Jowett men were guilty of contributory negligence. Four men had erected the aerial and during the process they had been careful to secure the aerial by guys and hand lines so that it could not fall. Nevertheless, when the two came to repair it, knowing that the guy wire at the southeast corner was loose and that possibly it might fall toward the power lines, they proceeded to lift, one on each side of the pipe. Because three of the wires remained fastened, tension and a drawing of the aerial toward the power lines was bound to ensue as the resultant of forces. The two men did more than lift. They drew the butt of the pipe out from the wall. There was no point in raising the pipe unless they also drew it out from the wall so that the tip would be lowered to a point where it would be within reach of

the roof so as to permit reattachment of the guy wires. This induced two new kinds of strain. First, the weight of the antennæ on the end of the long pipe and the pipe itself would tend to break the pipe as it reached a position near the horizontal; second, the U bolt at the peak of the roof was not removed or, as far as is disclosed by the evidence, even loosened. To pull the butt of the pipe out and up would require that the clamp bend or break and would add to the strain caused by the weight of the antennæ. The pipe actually broke about a foot below the clamp.

Without attempting particularly to justify the conduct of the Jowetts, plaintiffs contend that their lack of knowledge of the high voltage carried in the line protects them from the charge of contributory negligence. On this point they cite the cases of workmen required by their duties to work on roofs or otherwise near wires who knew of the presence of wires but did not realize the high current carried: Fitzgerald v. Edison Electric Co., 200 Pa. 540; MacDougall v. Penna. Power & Light Co., 311 Pa. 387; Yeager v. Edison Electric Company, 242 Pa. 101. Brillhart v. Edison Light & Power Co., 368 Pa. 307, 313 reiterates the familiar rule that purveyors of electricity are to be held to the highest degree of care but that "the general public is not bound to the high degree of foresight in respect of danger from electric wires as is the company maintaining them". See also on the point Kaufman v. Pittsburgh Railways Company et al., 363 Pa. 96, 100.

With due regard to this humane and sensible principle it must be observed that our adjudicated cases hold the member of the general public who is acting near electric lines to a much higher degree of care than plaintiffs contend for. The Kaufman case itself assumes that such a one is "bound to know that more or less danger from electricity was inherent in the transmission line". On the subject of contributory

negligence many cases may be cited. In Durinzi, Administrator, v. West Penn Power Company, 357 Pa. 576, a painter in a room in some fashion came into contact with wires six feet above his head. Recovery was denied. In Lindsay v. Glen Alden Coal Company, 318 Pa. 133, an experienced lineman ran up an embankment and touched defendant's wires. He was held to be contributorily negligent. In Matlack v. Penna. Power & Light Co., 312 Pa. 206, contributory negligence was held a bar to the case of a painter on a bridge who touched a wire which was located in a place almost inaccessible. In Aljoe et al. v. Penn Central Light & Power Co., 281 Pa. 368, recovery was denied on behalf of two workmen who were electrocuted while drawing an electric cable under the lines of a power company. In Geroski v. Allegheny County Light Co., 247 Pa. 304, recovery was denied a janitor who so manipulated a wire on a flag pole as to come in contact with defendant's power line.

In the case at bar the Jowetts were manipulating a long pipe which, as plaintiffs now say, was so tall and so near defendant's line as to carry to defendant warning of danger. If this was true danger should also have been apparent to the Jowetts. Although both the men were experienced neon sign technicians in this neigborhood the survivor, Jonathan Jowett, says they did not know of the high voltage carried by the wires. Nevertheless they knew that some damage to defendant's lines, to the telephone line, or to themselves was inevitable if they allowed the aerial to topple over on the lines. Perhaps mere breakage, perhaps interruption of telephone service or electric power service in the homes near by, perhaps a short circuiting of domestic electrical appliance, perhaps fire, perhaps a dangling wire carrying dangerous current — some damage was inevitable.

It would not do to allow a man repairing a church steeple who negligently allowed materials to fall into

a power line to defend by saying that he did not know whether the line carried high or low voltage. Nor does the testimony of Jonathan Jowett exculpate him or his son from contributory negligence. To be sure there is a presumption that due care on the part of Lee Jowett, now deceased, exists but this disappears when plaintiffs have produced evidence as to precisely what the conduct of the deceased was: Watkins v. Prudential Insurance Company, 315 Pa. 497, 503.

After a most careful review of the case we are of the opinion that the order of compulsory nonsuit was correctly entered.

Entertaining these views we make the following

*Order*

Now, June 1, 1954, the petition to remove the compulsory nonsuit is refused.